**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JAMES MAJOR; KATHLEEN MAJOR;**
**COLLEEN MAJOR; CASSANDRA KEIM;**
**PAUL TANNER, individually and as a parent**
**and natural guardian of Neva and Azreal Tanner;**
**TRUDI TANNER, individually and as a parent**
**and natural guardian of Neva and Azreal**
**Tanner; and ELIJHA TANNER,**

                              **Plaintiffs,**


                 **v.**                              **5:01-CV-618 (Lead)**
                                                        **(FJS/GJD)**

**ASTRAZENECA, INC.; AVENTIS**
**CROPSCIENCE USA, INC.; RHODIA, INC.;**
**RHONE-POULENC, INC.; STAUFFER**
**MANAGEMENT COMPANY; and**
**ZENECA, INC.,**

                         **Defendants.**
_____

_____

**KAREN M. GREEN and JEFFREY A. GREEN,**

                              **Plaintiffs,**


                 **v.**                              **5:00-CV-1736 (Member)**
                                                        **(FJS/GJD)**

**ASTRAZENECA, INC.; AVENTIS**
**CROPSCIENCE USA, INC.; RHODIA, INC.;**
**RHONE-POULENC, INC.; STAUFFER**
**MANAGEMENT COMPANY; and**
**ZENECA, INC.,**

                         **Defendants.**
_____

APPEARANCES                              OF COUNSEL

**MACKENZIE HUGHES LLP**                 **JEFFREY D. BROWN, ESQ.**
101 South Salina Street, Suite 600       **WILLIAM B. HUNT, ESQ.**
P.O. Box 4967
Syracuse, New York 13221-4967
Attorneys for Plaintiffs James Major,
Kathleen Major, Colleen Major, Cassandra
Keim, Paul Tanner, Trudi Tanner and
Elijha Tanner

**HANCOCK & ESTABROOK, LLP**            **EDWARD J. SMITH, III, ESQ.**
1500 MONY Tower I                        **WENDY A. MARSH, ESQ.**
Syracuse, New York 13221                 **CHRISTOPHER G. TODD, ESQ.**
Attorneys for Plaintiffs Karen M.
Green and Jeffrey Green

**BOND, SCHOENECK & KING, PLLC**         **THOMAS R. SMITH, ESQ.**
Once Lincoln Center
Syracuse, New York 13202-1355
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Currently before the Court are the following motions: (1) Defendants' motion to strike the

affidavit of William R. Sawyer, sworn to March 25, 2005, and the undated affirmation of

Michael A. Wolfson, both of which the Green Plaintiffs submitted, pursuant to Rules 26(a)(2)(B)

and 37(c)(1) of the Federal Rules of Civil Procedure; (2) Defendants' motion to preclude,

Sawyer, Wolfson, and Joseph M. Wittington from offering expert testimony on Plaintiffs' behalf,

pursuant to Rule 702 of the Federal Rules of Evidence and the *Daubert* line of cases;[1] (3)

---

[1] The Court notes that, although Defendants' motion to preclude does not mention
Millspaugh, *see* Dkt. No. 50 at Pt. 1, their memorandum of law in support of their motion does,

(continued...)

-2-

Defendants' motion for summary judgment with respect to the complaints in both of these consolidated actions; and (4) the cross-motion of Plaintiffs Karen M. Green and Jeffrey A. Green (the "Green Plaintiffs") for partial summary judgment (a) declaring Defendants liable on Plaintiff Karen M. Green's claim pursuant to 42 U.S.C. § 9607(a)(3), (4) for response costs (second cause of action) and (b) dismissing Defendants' counterclaims that seek to hold her liable for CERCLA response costs.

## II. BACKGROUND[2]

### A.      Site background

Plaintiffs allege that wastes that the Cowles Chemical Company ("Cowles") of Skaneateles Falls, New York, disposed of on the Old Taylor Farm Site ("Site") in Sennett, New York, have injured their persons and property.  In 1967, Cowles merged with the Stauffer Chemical Company ("SCC").  Defendant Aventis is the corporate successor to SCC.  Defendant Stauffer Management Company ("SMC") has contractually agreed to indemnify Defendant Aventis with respect to certain liabilities associated with the former SCC, including any liabilities associated with the Site.

As early as 1960, and continuing until March 1966, Cowles illegally dumped tarry residue from its production of toluic acid into a pit located at the Site.  Cowles' employees also frequently burned the residue in the pit.  After a nearby resident became ill and complained about

---

[1](...continued)
*see id.* at Pt. 4.

[2] Unless otherwise noted, all references to the Docket refer to entries in the Lead Case, 5:01-CV-618.

her well water, the Cayuga County Department of Health conducted an investigation of the Site. Subsequently, Cowles contracted with Skaneateles Excavation Service to excavate the tarry residue waste from the pit.

In mid-1998, Plaintiff Karen M. Green, who had purchased the Site on June 27, 1977, raised concerns about her drinking water with the Cayuga County Health Department and the New York State Department of Health ("NYSDOH").[3]  Sampling indicated the presence of extremely high levels of acetaone, MEK, ethylbenzene, 2-methyl 2-pentatone, toluene, -xylene, m&p xylene, butyl benzyl phthalate, 2,4 dimethylphenol, bis (2-ethylhexyl) phthalate, and 2-methylphenol.  Subsequently, NYSDOH requested that the New York State Department of Environmental Conservation ("NYSDEC") investigate the Site.  In May 1999, NYSDEC and Defendant SMC entered into an interim remedial measures program order ("Consent Order"), which required Defendant SMC to develop an interim remedial measures program ("IRM") for the Site, including the installation of carbon filter water purification systems for the drinking water supplies for the four residences in the vicinity of the Site.  The IRM also required Defendant SMC to conduct a preliminary site assessment ("PSA"), which included soil and groundwater sampling, that Defendant SMC conducted between October and November 2000.

Following the PSA, Defendant SMC implemented a source area removal interim remedial measure, pursuant to which it removed approximately 9,500 cubic yards of soil and 1,322,100 gallons of water from the Site.  On June 20, 2001, the Director of NYSDEC's Division of

_____

[3] Plaintiff Paul Tanner and his family live near Plaintiff Karen M. Green's property in the house in which he grew up.  Plaintiffs James and Kathleen Major purchased their house near Plaintiff Karen M. Green's property in 1985.  Plaintiff Jeffrey Green owns a tract of land adjacent to his mother's property.

Environmental Remediation wrote to Plaintiffs' counsel that

> [i]nformation received to date indicates that all contaminated soils
> were removed from the site during the Interim Remedial Measure
> (IRM). The considerable amount of on-site and off-site soil data
> generated by SMC before, during, and after the removal action
> indicates that there is no source soil contamination remaining. The
> NYSDEC's split sampling data is consistent with their findings.

See Dkt. No. 30 at Pt. 9 at 2.

Furthermore, on December 3, 2001, NYSDOH's Regional Toxics Coordinator wrote to

the Sennett Town Supervisor that

> [f]irst, is there a widespread general problem with residential wells
> being impacted by industrial waste disposed of in the 60's by
> Cowles Chemical, and recently remediated by Stauffer
> Management Company at the so-called Old Taylor Farm site?
> There is no evidence that there is. Extensive private well sampling
> in the area surrounding the site has not shown any site-related
> contaminants in any private drinking water supplies.

See id. at 16.


**B.    Litigation background**

The Green Plaintiffs filed their original complaint on November 14, 2000, see 5:00-CV-

1736 at Dkt. No. 1, and their amended complaint on January 17, 2001, see id. at Dkt. No. 3.

Plaintiffs James Major, Kathleen Major, Colleen Major, Cassandra Keim, Paul Tanner, Trudi

Tanner, and Elijha Tanner ("Major Plaintiffs") filed their complaint on April 26, 2001. See Dkt.

No. 1.

On September 20, 2001, Magistrate Judge DiBianco issued a Uniform Pretrial Scheduling

Order that applied to both cases. See Dkt. No. 10. That Order set a discovery deadline of

September 30, 2002. See id. at 2. The Order also required Plaintiffs to disclose their experts no

later than 150 days prior to September 30, 2002.  *See id.*

On September 21, 2001, Magistrate Judge DiBianco issued an Order consolidating the two actions for purposes of discovery and motions only.  *See* Dkt. No. 11.

On May 6, 2002, after the date that their expert disclosures were originally due, Plaintiffs asked Magistrate Judge DiBianco to extend the discovery and expert disclosure deadlines.  *See* Dkt. No. 14 at 1.  Specifically, they "requested that these deadlines be extended until a date after completion of a remedial investigation and feasability study ("RIFS") at the [Site] that may be required by the New York State Department of Environmental Conservation . . . ."  *See id.*  After hearing oral argument, Magistrate Judge DiBianco reset the discovery deadline to February 28, 2003, and Plaintiffs' expert disclosure deadline to October 30, 2002.  *See id.* at 2.

On September 8, 2003, Magistrate Judge DiBianco granted Plaintiffs' request to extend the discovery deadline to December 31, 2003.  *See* Dkt. No. 22 at 1.

On July 2, 2004, Magistrate Judge DiBianco once again extended the discovery deadline, this time to September 30, 2004.  *See* Dkt. No. 27 at 4.  He also permitted Plaintiffs to serve their Second Request for Production of Documents, dated June 9, 2004, on all Defendants.  *See id.* at 3.


### III. DISCUSSION

**A.      Defendants' motions to preclude Plaintiffs' experts' testimony and to strike Sawyer's and Wolfson's affidavits**

Defendants argue (1) that Wolfson's, Millspaugh's and Sawyer's expert reports do not satisfy Rule 702 of the Federal Rules of Evidence; (2) that Sawyer is not qualified as an expert in

the areas necessary to form the opinions that he sets forth in his new affidavit; (3) that Sawyer's

opinions do not rest on reliable data; (4) that Sawyer's opinions do not fit the facts of this case;

(5) that the methodology and techniques that Sawyer applied to the data are not generally

accepted in the relevant field; (6) that Sawyer's opinions are not the product of a reliable

methodology; (7) that Sawyer's opinions fail to rule out various alternative sources of

contamination that he himself disclosed; (8) that Sawyer's and Wolfson's opinions are irrelevant

to Plaintiffs' case because Plaintiffs' theories of causation, exposure, and liability are based solely

upon exposure to contaminated water and not exposure to dust particles; and (9) that

Whittington's appraisal of Plaintiffs' houses is not based upon a reliable methodology.

     In order for the Court to assess Defendants' motions to preclude these reports, it must

consider the rules governing the disclosure and supplementation of expert reports, the

qualifications of a witness to offer expert testimony, and the amendment of pleadings to conform

to the evidence.

     Pursuant to the Court's Uniform Pretrial Scheduling Order, Plaintiffs were required to

serve their experts' reports on or before October 30, 2002.  *See* Dkt. No. 14 at 2.  An expert's

report "shall contain [among other things] a complete statement of all opinions to be expressed,

the basis and reasons therefor [and] the data or other information considered by the witness in

forming the opinions . . . ."  Fed. R. Civ. P. 26(a)(2)(B).  Plaintiffs also had a duty to supplement

their required disclosures insofar as they learned that those disclosures were incomplete or

inaccurate, unless Defendants had already become aware of the new or correct information.  *See*

Fed. R. Civ. P. 26(e)(1).  Furthermore, Rule 37(c)(1) of the Federal Rules of Civil Procedure

provides, in pertinent part, that "[a] party that without substantial justification fails to disclose

information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless,

permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not

so disclosed." Fed. R. Civ. P. 37(c)(1).

Finally, Rule 702 of the Federal Rules of Evidence provides that,

> [i]f scientific, technical or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

To determine whether a proposed expert witness is qualified to testify, a court must make

"a preliminary assessment of whether the reasoning or methodology underlying the testimony is

scientifically valid and of whether that reasoning or methodology properly can be applied to the

facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). Among the

factors that a court may consider in making this assessment are

> – Whether a "theory or technique . . . can be (and has been) tested";
> – Whether it "has been subjected to peer review and publication";
> – Whether, in respect to a particular technique, there is a high
> "known or potential rate of error" and whether there are "standards
> controlling the technique's operation"; and
> – Whether the theory or technique enjoys "'general acceptance'"
> within a "'relevant scientific community.'" . . .

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (internal quotation omitted).

The goal of this assessment "is to ensure the reliability and relevancy of expert testimony.

It is to make certain that an expert, whether basing testimony upon professional studies or

personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Finally, Rule 15(b) of the Federal Rules of Civil Procedure provides that

> [w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time . . . . If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.  The court may grant a continuance to enable the objecting party to meet such evidence.

Fed. R. Civ. P. 15(b).

### 1. Plaintiffs' theory of the case

In their amended complaint, the Green Plaintiffs alleged, in pertinent part, that

> 44.   Upon information and belief, the solid and/or hazardous waste, hazardous substances and petroleum compounds have remained on the Site and have migrated throughout the Site and Property.
>
> 45.   Upon information and belief, the solid and/or hazardous waste, hazardous substances and other wastes and petroleum compounds disposed on the Site and Property have migrated into the drinking water well utilized by Plaintiffs.

*See* The Green Plaintiffs' Amended Complaint at ¶¶ 44-45.

The Major Plaintiffs' complaint contained essentially identical allegations.  *See* The Major Plaintiffs' Complaint at ¶¶ 42-43.  Neither complaint contained any specific allegations

that Plaintiffs had been exposed to air-borne contamination from the Site.

On March 26, 2001, the Green Plaintiffs and Defendants submitted their proposed joint civil case management plan, which stated that "[t]he factual basis for Plaintiffs' claims include the acts or omissions of Defendants, whole or in part, for the contamination of Plaintiffs' real property and exposure to Plaintiff Karen Green." *See* No. 00-CV-1736 at Dkt. No. 9. On August 31, 2001, the Major Plaintiffs and Defendants submitted their proposed joint civil management plan, which stated that "[t]he factual basis for Plaintiffs' claims include the acts or omissions of Defendants, in whole or in part, for the contamination of Plaintiffs' real properties and toxic exposures to Plaintiffs." *See* Dkt. No. 5. Neither plan indicated that Plaintiffs' claims of exposure were limited to their drinking water.

As noted, on September 20, 2001, Magistrate Judge DiBianco issued a Uniform Pretrial Scheduling Order that required Plaintiffs to disclose their expert witnesses not later than 150 days prior to September 30, 2002. *See* Dkt. No. 10 at 2. On May 6, 2002, Plaintiffs requested that the Court extend this deadline until after NYSDEC conducted a remedial investigation and feasibility study at the Site. *See* Dkt. No. 14 at 1. Magistrate Judge DiBianco did not grant Plaintiffs' request in full but did issue an amended scheduling Order that set October 30, 2002, as the deadline for Plaintiffs' disclosure of their experts. *See* Dkt. No. 14 at 2. Plaintiffs did, in fact, make their expert disclosures on October 30, 2002. *See* Dkt. No. 49 at Pt. 7 at 2.

### 2. Plaintiffs' medical expert – Wolfson

In his report, dated October 29, 2002, Wolfson sets out his qualifications, a summary of the allegations in the case, and a list of the items that he reviewed. *See* Dkt. No. 49 at Pt. 9 at 49-

50.  He then presents the following conclusions:

> Review of some of the documents noted above indicates that chemical wastes from the Cowles Chemical Company (Cowles) Skaneateles Falls plant dumped and burned on the Old Taylor Farm property contained a number of organic solvents including xylene and toluene.  In addition, the chlorinated solvent perchloroethylene was also apparently dumped and burned. Perchloroethylene is an animal carcinogen and human carcinogen. In addition, the burning of chlorinated hydrocarbons such as perchloroethylene results in the formation of dioxins, which are highly potent, multi-organ system carcinogens in humans.

> My future assessment of the facts in this case will include a detailed review of the medical records of the plaintiffs as well as available records of other individuals who resided on the contaminated property since the dumping and burning of chemical waste began in 1962.  In addition, I will review in detail the current and future test results characterizing the environmental contamination of the plaintiffs' property, water supply, and residences.  Finally, I will evaluate any past and current or potential future health risks posed by the property contamination in order to develop an ongoing medical surveillance protocol for the individuals exposed to the toxic contaminants.

*See id.* at 51.

Only one portion of Wolfson's report might be understood as a statement of his opinions: "Perchloroethylene is an animal carcinogen and human carcinogen.  In addition, the burning of chlorinated hydrocarbons such as perchloroethylene results in the formation of dioxins, which are highly potent, multi-organ system carcinogens in humans."  *See id.*  However, he does not provide any indication of the bases for these opinions.  Accordingly, the Court concludes that Wolfson's report does not satisfy Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

Twice in his report, Wolfson notes that he will have to supplement it in the future.  *See id.* at 49-50.  The record indicates that Plaintiffs did not supplement Wolfson's report until the Green

Plaintiffs submitted his affirmation on March 30, 2005, in support of their cross-motion for summary judgment.  *See* Dkt. No. 35 at Pt. 27.  Therefore, Wolfson's wholly inadequate report remained unsupplemented for almost two and one-half years.  Furthermore, since discovery in this case closed on September 30, 2004, *see* Dkt. No. 27 at 4, Plaintiffs did not supplement Wolfson's report until after the time that Defendants could have effectively responded to it.

Finally, the Wolfson "Affirmation" that the Green Plaintiffs filed in support of their cross-motion for summary judgment is not proper summary judgment evidence.  *See* Dkt. No. 35 at Pt. 27.  A party must support a summary judgment motion with affidavits.  *See* Fed. R. Civ. P. 56(e).  However, since Wolfson's affirmation is not notarized, it is not an affidavit; and, since it is not dated, it is not admissible as an unsworn declaration, 28 U.S.C. § 1746.

Accordingly, because Wolfson's report does not satisfy Rule 26(a)(2)(B), Plaintiffs failed to supplement his report as Rule 26(e)(1) requires and the report is otherwise not proper summary judgment evidence, the Court **grants** Defendants' motion to strike Wolfson's affirmation.  Moreover, because Defendants would certainly be prejudiced if, without further discovery, the Court permitted Wolfson to testify as to his newly disclosed opinions, the Court **grants** Defendants' motion to preclude Wolfson from providing expert testimony at trial.

### 3. Plaintiffs' toxicology expert – Sawyer

In his expert report, dated October 30, 2002, *see* Dkt. No. 49 at Pt. 9 at 29, Sawyer reaches the following conclusions:

> It is my opinion, to within a high degree of toxicological certainty that the source of the residential well water contaminants detected originated from the Cowles Chemical plant toxic dumping at the

Taylor Road site. . . . The results of analyses conducted to date reveal that Plaintiffs' [sic] have been exposed to chemicals which pose a certain level of toxicological risk.

*See id.* at 32.

It is my opinion, based upon the specific chemical properties identified by Cowles Chemical Company and Stauffer Management Co. that open pit pyrolysis of the historical chemical including phthlates, phenols, toluic acid, toluene, xylenes, MEK, tar residue and other chemicals identified reacted with "miscellaneous dry cleaning chemicals", perchloroethylene, sulfuric acid and acetic acid would produce substantial levels of highly toxic semivolatile polynuclear aromatic hydrocarbons (PAHs) and certain chlorinated hydrocarbons. . . .

* * *

It is my firm opinion, to within a reasonable degree of toxicological certainty that the plaintiffs' [sic] have been exposed to significant environmental contaminants originating from the Cowles Chemical Company processes and subsequent dumping and burning of wastes at the Taylor Farm.  Pyrolosis of the chemical constituents identified to date provide the basic nucleus for the formation of semivolatile polynuclear aromatic hydrocarbons (PAHs) and certain chlorinated hydrocarbons consistent with highly significant long-term human health effects which require specific medical monitoring. . . .

*See id.* at 36.

With respect to air-borne contamination, Sawyer made the following comments:

The previous production via open pit pyrolysis of highly potent human carcinogens including certain PAHs and chlorinated hydrocarbons of this toxicity *is currently being evaluated.* Previous production of these compounds by pyrolysis with an open smoke plume in the very close proximity of the predominant downwind residential locations would have resulted in direct air impact via smoke and accumulation of contaminated soils and dusts into the homes.  Contaminated soils and dust impacted the homes primarily through truck tracking of soils onto the immediate residential roadways with subsequent dust generation.  The

-13-

longevity of these semivolatile contaminates are of specific
concern to residents due to the normal rates of ingestion
of household dust.  Using valid methods of science, analytical testing
*will be performed* to further evaluate these hazards.

\* \* \*

. . . . The extent of PAH contamination and potential of ongoing
exposures via ingestion of household dust *is currently being
evaluated*.  Additional documentation from the defendants
including all prior health and safety plans developed for
contractor's use is required for review.  Additionally, further
disclosure of the historical processes used at the plant including all
purchased chemical reagents is needed.  I also *intend to evaluate*
all future health risks posed by previous and current property
contamination to aid in the development of an ongoing medical
monitoring (surveillance) protocol for residents who have
sustained significant chronic toxic exposures.

*See id.* at 36-37 (emphasis added).

Despite Sawyer's statements about the work that he was still performing and would yet

perform, the record contains no indication that he ever supplemented his report.

On March 30, 2005, Plaintiffs submitted Sawyer's affidavit dated March 25, 2005.  *See*

Dkt. No. 36 at Pt. 10.  In this affidavit, Sawyer states that he "*recently* [in February and March

2005] assessed the attic dust of the plaintiff's [sic] homes . . . for evidence of 'the possible

formation of secondary combustion products'.  Attempted burning of an aromatic enriched tar as

described in Exhibit 2 would be expected to release and generate substantial quantities of PAHs."

*See id.* at ¶¶ 13-14.[4]  He further states that

_____

[4] Defendants filed their summary judgment motion on December 27, 2004, with
Plaintiffs' response papers due on January 11, 2005.  *See* Dkt. No. 30.  On January 10, 2005, the
Green Plaintiffs and, on January 11, 2005, the Major Plaintiffs filed letter requests seeking an
extension of their time to respond until March 29, 2005.  *See* Dkt. Nos. 31, 33.  Defendants
consented to this extension, and the Court granted it.  *See* Dkt. No. 33.

> [t]he analyses reveal hazardous levels of PAHs within the attic
> dust. . . . No exogenous PAH sources were identified within the
> rural environment.  The heat source for each home was inspected
> along with a history of local events. . . .

> 15.    An extended list of 40 PAHs was analyzed by
> Maxxam/PSC Analytical Services, Inc. . . . The objective
> analytical results reveal a highly distinct pattern of specific
> PAHs common to all 3-homes [sic] . . . . Based upon the
> unique signature of PAHs within the attic dust at
> significantly elevated levels, I am certain to within a very
> high degree of scientific certainty that the contaminants
> identified are ***not*** from independent event [sic] that
> occurred within each house such as smoking cigarettes,
> burning wood, coal, food cooking smoke [sic].

*See id.* at ¶¶ 14-15.

Sawyer's affidavit ends with the following conclusions:

> 32.    It is my opinion, based upon the specific properties
> identified by Cowles Chemical Company and Stauffer
> Management Co. that open pit pyrolysis of the historical
> chemicals including toluic acid water tar, asphaltic tar,
> phthalates, phenols, toluic acid, toluene, xylenes, MEK, tar
> residue and other chemicals identified reacted with
> "miscellaneous dry cleaning chemicals", perchloroethylene,
> sulfuric acid and acetic acid substantially released
> carcinogenic PAHs and aromatic hydrocarbons into the
> environment.  Analytical testing of residential wells
> performed by NYSDEC during 1998 revealed the presence
> of certain PAHs.

> 33.    It is my firm opinion, to within a reasonable degree of
> toxicological certainty, that all of the named plaintiffs' [sic]
> have been exposed to significant environmental
> contaminants originating from the Cowles Chemical
> Company processes and subsequent dumping and burning
> of wastes at the Taylor Farm.  Pyrolysis of the chemical
> constituents identified to date provide the basic nucleus for
> the formation of PAHs and certain chlorinated
> hydrocarbons consistent with highly significant long-term
> human health effects which require specific medical

> monitoring.  The Plaintiffs' well water has previously
> revealed the presence of PAHs consistent with the
> formation of toxic PAHs.  Future health risks posed by
> previous and current property contamination require
> immediate and ongoing medical monitoring (surveillance).
> The current level of contaminates measured within the
> plaintiffs' homes requires professional abatement to prevent
> further chronic toxic exposures.

*See id.* at ¶¶ 32-33.

Contrary to Defendants' characterization of Sawyer's affidavit, it neither abandons the

theory of water contamination nor expresses a completely new theory of air-borne contamination.

However, the problem with Sawyer's affidavit is that it contains opinions based upon new

evidence, i.e., Sawyer's attic dust collection.  Rule 26(a)(2)(B) requires that Sawyer's expert

report contain "the basis and reasons" for his opinions and "the data or other information" that he

considered in forming those opinions.  Fed. R. Civ. P. 26(a)(2)(B).  However, Sawyer's expert

report contains no information about attic-dust testing.  Furthermore, Sawyer did not disclose the

results of his attic-dust testing until six months after the close of discovery.  *See* Dkt. Nos. 27, 36

at Pt. 10.  Indeed, Sawyer did not even conduct this testing until after Defendants had filed their

summary judgment motion.

Defendants contend, based upon their characterization of Plaintiffs' theory of the case,

Sawyer's expert report, and Sawyer's affidavit, that the Court should strike Sawyer's affidavit and

preclude him from offering expert testimony.  To which Plaintiffs respond candidly that

> [t]he plain truth is that Plaintiffs have been relying on the
> DEC to thoroughly and competently do their job in protecting the
> public, including the Plaintiffs, from polluters such as the Cowles
> Chemical Company. . . . The Defendants are correct in arguing to
> the Court that the Plaintiffs have been waiting for the Record of
> Decision ("ROD") from the DEC. . . .

It thus became clear to Plaintiffs that the expensive testing, which prior to that point had been delayed in anticipation that the DEC would conduct a RI/FS, would have to be done by them alone.  Plaintiffs, all folks of rural and modest means, were and are completely disadvantaged to hire the magnum of experts required to do the necessary environmental testing in this matter. . . .

Having been forced to confront the reality that the DEC was not going to conduct the necessary testing, Plaintiffs banded together, pooled their monies, and paid Dr. William Sawyer to conduct the necessary environmental testing . . . .

This background information is being offered to the Court as a very real and practical explanation as to why the environmental testing done in March 2005 was not completed until that date.  Plaintiffs at all times held out optimism that the DEC would conduct the necessary investigation and could not reasonably anticipate the unfavorable decision to close their investigation.  That being said, and having been faced with the reality that the DEC would not aid them, Plaintiffs have undertaken the necessary environmental testing, at considerable expense, and confirmed Dr. Sawyer's initial conclusions made in the expert disclosure provided in October 2002, that the prylosis [sic] of toxic chemical wastes for an extended period of time . . . did present a clear and imminent present health danger to the Plaintiffs.

*See* Dkt. No. 59 at 7-10.

Although the Court sympathizes with Plaintiffs' plight, the fact remains that their failure to supplement Sawyer's expert report is not harmless.  Therefore, pursuant to Rule 37(c)(1), the Court will preclude Sawyer from testifying to the new evidence and opinions contained in his affidavit.  However, the Court finds that Sawyer is qualified to testify as an expert to the opinions contained in his expert report and, therefore, will permit him to testify about those opinions.[5]

---

[5] The essence of Sawyer's opinions in his expert report is that Plaintiffs' well water contains contaminants that are hazardous to human health and that are the expected by-products of Defendants' activity at the Site.  The Court's review of the record indicates that this opinion is reasonably reliable and would be helpful to a factfinder.

Accordingly, the Court grants Defendants' motion to strike Sawyer's affidavit and denies

Defendants' motion to preclude Sawyer from testifying as an expert regarding the matters that he

discussed in his expert report.


### 4. Plaintiffs' appraisal expert – Whittington

Whittington, who is Plaintiffs' appraisal expert, submitted a report containing appraisals

of Plaintiffs' real property.  His appraisal of Plaintiff Karen Green's property is dated October 24,

2002.  *See* Dkt. No. 49 at Pt. 7 at 16.  In this appraisal, he states that, as of September 26, 2002,

her property had a market value of $200,000.  *See id.*  However, under the heading "Conditions

of Appraisal," he directs the reader to the attached addenda.  *See id.*  One addendum to the

appraisal provides, in pertinent part, that

> THE SUBJECT PROPERTY CONTAINS WITHIN ITS
> BOUNDRIES [sic] AN INACTIVE HAZARDOUS WASTE SITE
> IDENTIFIED AS SITE # 70611 ON THE NEW YORK STATE
> REGISTRY.  THE SITE IS DESIGNATED CLASSIFICATION
> "2" PURSUANT TO ENVIRONMENTAL CONSERVATION
> LAW #27-1305.4(B) INDICATING A DETERMINATION BY
> NYSDEC THAT THE SITE PRESENTS A SIGNIFICANT
> THREAT TO THE PUBLIC HEALTH OR THE
> ENVIRONMENT.
>
> TAKING INTO CONSIDERATION THE DEFINITION
> OF FAIR MARKET VALUE, THE EFFECTS OF THE
> PRINCIPLE OF SUBSTITUTION ON REAL ESTATE, AND
> THE FACT THAT THE SITE CONTAINS A HAZARDOUS
> WASTE SITE WHICH MAY BE OF A DANGER TO THE
> HEALTH AND THE ENVIRONMENT, IT IS THE OPINION OF
> THE UNDERSIGNED APPRAISER THAT THESE FACTS
> HAVE A DETRIMENTAL EFFECT ON THE VALUE OF THE
> SUBJECT PROPERTY.
>
> IT IS THE OPINION OF THE UNDERSIGNED NEW

> YORK STATE CERTIFIED REAL ESTATE APPRAISER, AND
> NEW YORK STATE LICENSED REAL ESTATE BROKER
> THAT THESE FACTORS WOULD PROVE THE SUBJECT
> PROPERTY TO HAVE NO MARKET VALUE AS OF THE
> DATE OF INSPECTION, AND FURTHER THAT NO
> PRUDENT PURCHASER WOULD BUY THE SUBJECT WHEN
> PROPERTY [sic] DISCLOSURE IS AVAILABLE OR WHEN
> PERFORMING DUE DILIGENCE.
>
>        IT SHOULD BE NOTED THAT A RESIDUAL VALUE
> MAY BE ESTABLISHED AFTER CLEAN UP IS
> SUCCESSFULLY COMPLETED.

*See id.* at 21-22.

Whittington's undated appraisal of Plaintiff Jeffery Green's property provides that, as of September 26, 2002, it had a market value of $51,000. *See id.* at 31. However, this appraisal has an addendum that states that the property was across the street from the Site and that, consequently, it had no market value. *See id.* at 32-33. Other than indicating that this property is close to, rather than inclusive of the Site, the last four paragraphs of this addendum are identical to the corresponding paragraphs of the addendum to the appraisal of Plaintiff Karen Green's property.

Whittington's appraisal of Plaintiff James Major's property, dated October 29, 2002, provides that, as of September 26, 2002, it had a market value of $127,000. *See* Dkt. No. 49 at Pt. 8 at 7. This appraisal also contained an addendum that stated that the subject property lies within one-half mile of the Site and that, consequently, it had no market value. *See id.* at 13-14. Again, other than noting the relative position of the subject property to the Site, the last four paragraphs of this addendum are identical to the corresponding paragraphs of the addendum to the appraisal of Plaintiff Karen Green's property.

Whittington's appraisal of Plaintiff Paul Tanner's property, dated October 24, 2002, provides that, as of September 26, 2002, it had a market value of $89,000. *See id.* at 19. Although the record contains an addendum to this appraisal, the first page of the addendum is not in the record. *See id.* at 32. Furthermore, the addendum incorrectly states that "THE SITE CONTAINS A HAZARDOUS WASTE SITE." *See id.* However, consistent with the addenda to the other three appraisals, this one concludes that, because of the Site, Paul Tanner's property has no market value. *See id.*

There are several problems with Whittington's expert report. First, and most importantly, he does not state the bases for his opinion that no prudent purchaser would buy the subject properties and that the subject properties have no market value. Although it is not implausible that the properties would have no market value, Whittington would have had to engage in some course of informed reasoning to reach a reliable conclusion to this effect. However, he does not mention whether the Site affected the subject properties' water supplies, their soil conditions, or their air qualities. Nor does he indicate how the facts that Plaintiffs had identified a party responsible for the Site and that that party had already begun remedial measures might affect market value.[6] Finally, even if the market value of properties at increasing distances from the Site were zero, an expert appraiser would have to take into account the effect of those distances, which Whittington did not do.[7]

---

[6] In fact, another of Plaintiffs' experts, Millspaugh, states that Defendant SMC removed contaminated soil from the Site between January and March 2001, well before Whittington appraised the subject properties. *See* Dkt. No. 49 at Pt. 8 at 41.

[7] The Court also notes that it is difficult to reconcile the positive and zero market values that Whittington gives for each property. Although one explanation of the dual values could be

(continued...)

Moreover, it is clear that Whittington's expert report fails to satisfy Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure because he fails to provide the bases for his opinions that all of the subject properties have no market value. There is also no indication in the record that Plaintiffs complied with Rule 26(e)(1) by supplementing his report to provide the missing bases for his opinions. In his affidavit, which Plaintiffs filed in response to Defendants' motion to preclude, he attempts to explain the basis for his opinion that Plaintiff Karen Green's property has no market value by asserting that, on May 28, 2002, the Town of Sennet assessed her property at $0.00. *See* Dkt. No. 56 at Pt. 16 at ¶ 13. However, his expert report made no mention of the tax assessment. In this affidavit, he also attempts to explain his conclusion that Plaintiffs Jeffery Green's, James Major's, and Paul Tanner's properties have no market value by referring to the "data retrieved from the sources listed in the respective URARs . . . ." *See id.* at ¶ 16. However, the supplemental addenda to the appraisals for these properties to which he apparently refers contain *no* discussion of the effects of the Site on the market values of these properties. *See* Dkt. No. 49 at Pt. 8 at 4, 12. Furthermore, the supplemental addenda to the appraisal of Plaintiff Paul Tanner's property merely incorporates the addendum that concludes that the property has no

---

[7](...continued)
that the positive value reflects the value of the property without consideration of the contamination of the Site, that explanation does not appear to make sense within the context of Whittington's report. Each of the primary appraisals appears on a Freddie Mac/Fannie Mae form. One section of the form provides space for the appraiser to comment on "[a]dverse environmental conditions (such as, but not limited to, hazardous wastes, toxic substances, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property." *See, e.g., id.* at 18. Whittington filled in this section with "[s]ee attached addenda." *See, e.g., id.* Therefore, it appears that the bottom-line market value on the appraisal forms was intended to reflect the effects of all relevant factors, including environmental ones. In light of this information, the dual values remains unexplained.

market value.  *See id.* at 24.  Therefore, as was the case with his expert report, his affidavit sheds

no light on the bases for his conclusion that the subject properties have no market value.

Plaintiffs have offered no explanation for the insufficiency of Whittington's expert report

or their failure to supplement that report.  Without Whittington disclosing the bases for his

opinions, Defendants will be prejudiced in their ability to prepare effectively to cross-examine

him at trial.  Furthermore, without Whittingham disclosing the bases for his opinions, it is

impossible for the Court to conclude that his testimony would be reliable or beneficial to the

factfinder.  Accordingly, the Court grants Defendants' motion to preclude Whittingham from

testifying as an expert at trial.

### 5. Plaintiffs' environmental engineering expert – Millspaugh

As noted above, Defendants do not mention Millspaugh in their motion to preclude, but

they do mention him in their memorandum of law in support of that motion.  A motion "shall

state with particularity the grounds therefor, and shall set forth the relief or order sought."  Fed.

R. Civ. P. 7(b)(1).  Moreover, although Defendants' memorandum of law gave Plaintiffs notice

that Defendants sought the preclusion of Millspaugh's testimony, their motion did not.

Nonetheless, the Court will address the merits of this motion.

The nature of Defendants' argument for the preclusion of Millspaugh's testimony is

unclear.  They contend that "Mark P. Millspaugh, P.E. . . ., Plaintiffs' environmental engineer,

and the expert responsible for establishing Plaintiffs' *prima facie* cases of exposure, does not

offer in this original report any opinion to substantiate the exposure alleged."  *See* Dkt. No. 50 at

Pt. 4 at 6-7.

In his expert report, dated October 29, 2002, Millspaugh concludes that

> [t]he limited [Preliminary Site Assessment] and [Interim Remedial
> Measure] investigation conducted at the Site clearly indicate that
> hazardous wastes and hazardous substances were disposed of at the
> Site and released into the environment.  Soil and groundwater at
> and in the vicinity of the Site have been and remain contaminated.
> The NYSDEC has not as of yet required SMS to undertake an
> [Remedial Investigation/Feasibility Study], as required by the
> NYSDEC's regulations, policies and guidance.  As a result, the full
> nature and extent of contamination at and in the vicinity of the Site
> remains unknown.  In my professional opinion, the uncontrolled
> disposal of hazardous waste at the Site in close proximity to
> residential water supply wells poses an imminent and substantial
> endangerment to public health and the environment and I cannot
> conclude that the IRM has eliminated that imminent and
> substantial endangerment.  It is my further opinion that the data
> generated through the IRM demonstrates that an RI/FS must be
> completed.
>
> In the absence of an RI/FS, the Site and regional hydrology, the
> fate of the contamination within the environment and the effects on
> human health and the environment remain unknown.  I am
> particularly troubled as the regional geology suggests the existence
> of geological formations characterized by rapid and unpredictable
> groundwater flow as reportedly demonstrated in the 1960s when
> tar-like residue migrated from the Site to a nearby residential water
> supply well.

*See* Dkt. No. 49 at Pt. 8 at 49-50.

Defendants' argument for the preclusion of Millspaugh's testimony seems to be that,

because his testimony fails to do for Plaintiffs what Defendants believe Plaintiffs want his

testimony to do, the Court should preclude it.  However, Defendants have not addressed whether

Millspaugh is qualified, whether he applied a reliable method in a reliable manner, or whether his

testimony will be helpful to the factfinder.  The Court, however, does agree with Defendants that

Millspaugh's report does not articulate a pathway of exposure of Plaintiffs to contaminants from

the Site.  Therefore, if Millspaugh were to seek to testify about such a pathway, Defendants could

seek the preclusion of such testimony because it was not included in his report.  Nonetheless,

Defendants' argument does not support their conclusion that the Court should preclude

Millspaugh from offering **any** expert testimony.  Accordingly, the Court denies Defendants'

motion to preclude Millspaugh from testifying as an expert at trial.


**B.      Defendants' motion for summary judgment**

   *1. Standard of review*

   A court may grant summary judgment when the moving party carries its burden of

showing the absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c).  In making

this determination, the court must resolve all ambiguities and draw all reasonable inferences in a

light most favorable to the non-moving party.  *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.

1991) (citation omitted).  If the moving party has met its burden, the nonmoving party may not

rely upon his pleadings but must come forward with specific facts showing that there is a genuine

issue for trial.  *See* Fed. R. Civ. P. 56(e).  "A dispute is not 'genuine' unless 'the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.'"  *N.Y. Stock Exch., Inc. v.

N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

   In support of their motion, Defendants argue (1) that Plaintiffs have no credible evidence

that exposure to Site-related contaminants has caused them injury; (2) that Plaintiffs' claims

under Section 7002 of RCRA fail because there is no imminent and substantial endangerment;

(3) that the Court should dismiss Plaintiffs' CERCLA claims because Plaintiffs have incurred no

recoverable response costs and because there is no valid contribution claim; (4) that the

applicable three-year statute of limitations bars some of Plaintiffs' claims; (5) that Plaintiffs may

not recover for fear of future injury; (6) that Plaintiffs may not recover damages for battery; (7)

that Plaintiffs may not recover for intentional infliction of emotional distress; (8) that Plaintiffs

may not recover response costs or damages under New York Navigation Law; (9) that the Court

must dismiss Plaintiffs' trespass claims; (10) Plaintiffs' claims for latent injury, pain and

suffering, and hypersensitivity do not state valid claims for relief; (11) that *res ipsa loquitur* is

not a separate theory of liability; (12) that the Court should dismiss Plaintiffs' restitution claims;

(13) that Plaintiffs do not have a valid claim for contribution under Article 14 of the New York

Civil Practice Law and Rules; and (14) that the Court must dismiss Plaintiffs' claims for

diminution in property value because there is no right to recover stigma damages without an

actual physical invasion or damages.


### 2. Plaintiffs' medical monitoring claims

#### a. Causation

Defendants contend that Plaintiffs have no evidence that contaminants from the Site

caused their alleged health problems.

In response, Plaintiffs point to the following medical problems.  Plaintiff Karen M. Green

has had contact dermatitis, eye irritation, elevated liver enzymes, cervical cancer, headaches, and

an unexplained illness that resulted in chest pressure.  *See* Dkt. No. 30 at Pt. 3 at ¶ 50.  Plaintiff

Jeffrey Green has had a colon polyp, fever, and fatty deposits in his arms, abdomen, and back.

*See* Dkt. No. 35 at Pt. 27 at ¶ 51.  Plaintiff Kathleen Major has had a spastic colon.  *See* Dkt. No.

34 at Pt. 1 at ¶¶ 53-54.  Plaintiff Cassandra Major has had a breast tumor.  *See id.* at ¶ 55.

Plaintiff James Major has had high blood pressure.  *See id.* at ¶ 56.  Plaintiff Trudi Tanner has

had two hysterectomies.  *See id.* at ¶ 57.  Plaintiff Paul Tanner has had skin rashes.  *See id.* at

¶ 58.  Plaintiff Elijha Tanner has had a birth defect in his pectoral muscle and Weber-Christian

Disease.  *See* Dkt. No. 34 at Pt. 1 at ¶¶ 59-60.  Plaintiff Azreal Tanner has had asthma.  *See id.* at

¶ 61.  Despite these complaints, however, no Plaintiff has produced expert testimony linking his

or her medical condition to Site contaminants.[8]


### b. Medical monitoring

Defendants argue that Plaintiffs cannot establish a claim for medical monitoring.

> Under the prevailing case law, in order to maintain a cause of
> action for . . . future medical monitoring costs following exposure
> to a toxic substance . . ., a plaintiff must establish both that he or
> she was in fact exposed to the disease-causing agent and that there
> is a "rational basis" for his or her fear of contracting the disease . . .
> .

*Abusio v. Consol. Edison Co. of N.Y., Inc.*, 238 A.D.2d 454, 454-55 (2d Dep't 1997) (internal
citations omitted).

Courts have "construed 'rational basis' to mean 'the clinically-demonstrable presence of a

toxin in the plaintiff's body, or some other indication of a toxin-induced disease' . . ."  *DiStefano*

---

[8] The Court is aware that, in his affidavit, Wolfson states that contaminants from the Site
were more likely than not the cause of Plaintiff Karen Green's cervical cancer, *see* Dkt. No. 35 at
Pt. 27 at ¶ 54, that one of the Site contaminants is an eye irritant and affects the central nervous
system and liver, *see id.* at ¶ 51, that certain Site contaminants are associated with skin rashes
and elevated liver enzymes, *see id.* at ¶ 55, and that certain Site contaminants are associated with
"respiratory disease including chronic bronchitis . . . ," *see id.*  However, for the reasons noted in
its discussion of Wolfson's affidavit, the Court has stricken this affidavit from the record and,
therefore, Plaintiffs cannot rely upon it to support their contention that the contaminants at the
Site caused their medical problems.

*v. Nabsico, Inc.*, 2 A.D.3d 484, 485 (2d Dep't 2003) (internal citations omitted); *see also Atkins v. Exxon Mobil Corp.*, 9 A.D.3d 758, 759 (3d Dep't 2004) (citation omitted).

None of the Plaintiffs in this case have presented any evidence that their bodies contain toxins. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' medical monitoring claims.

### 3. Plaintiffs' RCRA claims

All Plaintiffs assert claims pursuant to § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).[9] To recover under this provision, a plaintiff must show that

> (1) the defendant was or is a generator or transporter of solid or hazardous waste or owner or operator of a solid or hazardous waste treatment, storage or disposal facility, (2) the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA, and (3) that the solid or hazardous waste in question may pose an imminent and substantial endangerment to health or the environment.

*Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608 (2d Cir. 1999) (citations omitted).

———————————

[9] Section 6972(a) provides, in pertinent part, that

> [e]xcept as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf –
> **(1)(A)** . . .
> **(B)** against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. . . .

42 U.S.C. § 6972(a)(1).

Moreover, although a plaintiff may seek injunctive relief under this section, it does not provide for the recovery of response costs. *See Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996).

In light of the Court's rulings regarding Wolfson's and Sawyer's affidavits, the only admissible evidence in the record is that Plaintiffs' well water contains traces of contaminants at levels below EPA and New York State standards. *See* Dkt. No. 36 at Pt. 10 at 10 n.** ("Recent 1998-2003 well water data has detected PAHs; however, at low levels."); Dkt. No. 47 at Pt. 5 at 13 (NYSDEC Record of Decision) ("Through the source removal IRM and the installation of residential water supply treatment systems, the potential direct contact pathways were eliminated. Drinking water supplies of nearby residents with water supply treatment systems have been tested extensively before, during, and after the IRM and have not shown site-related contamination. . . ."). Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' RCRA claims.

### 4. Plaintiffs' CERCLA claims

#### a. Recovery of response costs

All Plaintiffs, except Plaintiff Jeffery Green, assert claims pursuant to § 107(a)(3), (4) of CERCLA, 42 U.S.C. § 9607(a)(3), (4).[10]  Defendants contend that there is no evidence that

---

[10] Section 9607(a) provides, in pertinent part, that

> [n]otwithstanding any other provision or rule of law, and subject
> only to the defenses set forth in subsection (b) of this section –

(continued...)

Plaintiffs have incurred recoverable response costs.  Plaintiffs respond that they have incurred

several recoverable response costs, specifically, attorney's, consultant's and expert's fees.

> A *prima facie* cause of action under CERCLA requires a plaintiff
> to establish: (1) defendant fits one of the four classes of responsible
> parties outlined in § 9607(a); (2) the site is a facility; (3) there is a
> release or threatened release of hazardous substances at the facility;
> (4) the plaintiff incurred costs responding to the release or
> threatened release; and (5) the costs and response actions conform
> to the National Contingency Plan set up under the Act and
> administered by the EPA in order to prioritize hazardous substance
> release sites throughout the nation.

*B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992) (citation omitted).

### *1. The Green Plaintiffs*

The Green Plaintiffs assert that they have incurred recoverable attorney's fees related to

---

[10](...continued)

\* \* \*

> **(3)** any person who by contract, agreement, or otherwise
> arranged for disposal or treatment, or arranged with a transporter
> for transport for disposal or treatment, of hazardous substances
> owned or possessed by such person, by any other party or entity, at
> any facility or incineration vessel owned or operated by another
> party or entity and containing such hazardous substances, and
> **(4)** any person who accepts or accepted any hazardous
> substances for transport to disposal or treatment facilities,
> incineration vessels or sites selected by such person, from which
> there is a release, or a threatened release which causes the
> incurrence of response costs, of a hazardous substance, shall be
> liable for –

\* \* \*

> **(B)** any other necessary costs of response
> incurred by any other person consistent with the
> national contingency plan . . . .

42 U.S.C. § 9607(a).

the negotiation of access to the Site with Defendants.  However, the Second Circuit recently held

that, since site-access negotiations "primarily protect[] the interests of [the plaintiff] as the

landowner," attorney's fees associated with those negotiations are not necessary response costs.

*Syms v. Olin Corp.*, 408 F.3d 95, 104 (2d Cir. 2005).  Accordingly, the Court grants Defendants'

motion for summary judgment with respect to this claim for attorney's fees.

The Green Plaintiffs also assert that they incurred recoverable attorney's fees related to

the identification of potentially responsible parties.  The record indicates that they have incurred

$135 in such attorney's fees.  *See* Dkt. No. 35 at Pt. 25 at 4.  The Supreme Court has held that

such attorney's fees are recoverable response costs under CERCLA.  *See Key Tronic Corp. v.*

*United States*, 511 U.S. 809, 820 (1994) (footnote omitted).  Accordingly, the Court denies

Defendants' motion for summary judgment with respect to this claim for attorney's fees and

concludes that the Green Plaintiffs are entitled to recover attorney's fees in the amount of $135.

Finally, the Green Plaintiffs assert that they incurred recoverable consultant's fees.

Specifically, they claim that they "retained Sterling Environmental Engineering, P.C. . . . to

evaluate the investigation and remediation of the hazardous substances at [the Site]."  *See* Dkt.

No. 35 at Pt. 2 at 17.  The record indicates that Sterling Environmental Engineering, P.C.

("Sterling") provided comments to state agencies about Defendants' proposed remedial actions

that the agencies used to alter those actions.  *See* Dkt. No. 36 at Pt. 1 at ¶¶ 20, 24.

A plaintiff may recover consultant's fees under CERCLA if they are "necessary costs of

response . . . consistent with the national contingency plan."  42 U.S.C. § 9607(a)(4)(B).

CERCLA defines "response" as "remove, removal, remedy, and remedial action . . . ."  42 U.S.C.

§ 9601(25).  CERCLA further defines "remove" and "removal," in pertinent part, as

> the cleanup or removal of released hazardous substances from the
> environment, such actions as may be necessarily taken in the event
> of the threat of release of hazardous substances into the
> environment, such actions as may be necessary to monitor, assess,
> and evaluate the release or threat of release of hazardous
> substances, the disposal of removed material, or the taking of such
> other actions as may be necessary to prevent, minimize, or mitigate
> damage to the public health or welfare or to the environment,
> which may otherwise result from a release or threat of release. . . .

42 U.S.C. § 9601(23).

    CERCLA defines "remedy" and "remedial action," in pertinent part, as

> those actions consistent with permanent remedy taken instead of or
> in addition to removal actions in the event of a release or
> threatened release of a hazardous substance into the environment,
> to prevent or minimize the release of hazardous substances so that
> they do not migrate to cause substantial danger to present or future
> public health or welfare or the environment. . . .

42 U.S.C. § 9601(24).

    Assuming that the plaintiffs' ability to recover consultant's fees under CERCLA is similar
to their ability to recover attorney's fees, such fees are recoverable if the consultation
"significantly benefited [sic] the entire cleanup effort and served a statutory purpose apart from
the reallocation of costs." *Key Tronic*, 511 U.S. at 820.  Applying this rule to the Green
Plaintiffs' request to recover consultant fees, the Court concludes that there is a genuine issue as
to whether some or all of these fees are recoverable response costs.  Accordingly, the Court
denies Defendants' motion for summary judgment regarding this aspect of Plaintiffs' CERCLA
response costs claim.

### 2. The Major Plaintiffs

The Major Plaintiffs contend that they have incurred "laundry and filter expenses necessitated by the negative effects of Defendants' activities on their water supply." *See* Dkt. No. 34 at pt. 2 at 6.  Plaintiffs offer no legal basis to support a finding that these expenses constitute "response costs."  Accordingly, the Court grants Defendants' motion for summary judgment regarding this aspect of Plaintiffs' CERCLA response costs claims.

The Major Plaintiffs also contend that they are entitled to recover the attorney's fees that they paid to their then-attorney, Jeffrey Lacey, to send a May 12, 1999 letter to NYSDEC and NYSDOH that "sought an expanded groundwater monitoring program and made recommendations as to how the investigation and remediation of the contamination ought to be conducted." *See* Dkt. No. 34 at Pt. 2 at 5.  Although Defendants argue that the Major Plaintiffs' attorney's fees were intended merely to protect their own interests, the proper inquiry is whether the expense was a necessary one that advanced the cleanup.  Based upon the record in this case, in particular the plain language of this letter, the Court concludes that this expense was a necessary one; and, therefore, the Court denies Defendants' motion for summary judgment with regard to this part of Plaintiffs' CERCLA response costs claims and awards Plaintiffs the attorney's fees that they seek with regard to the amount that they paid to Mr. Lacey for writing the May 12, 1999 letter to NYSDEC and NYSDOH.

Finally, although Plaintiffs contend that the fees that they have paid to Wolfson and Sawyer are CERCLA response costs, they have not explained how Wolfson's and Sawyer's activities contributed to the cleanup.  Accordingly, the Court grants Defendants' motion for summary judgment with respect to this aspect of Plaintiffs' CERCLA response costs claims.

### 3. Summary

Accordingly, for the above-stated reasons, the Court concludes that the attorney's fees that the Green Plaintiffs incurred to identify potentially responsible parties and the attorney's fees that the Major Plaintiffs incurred to communicate with state agencies constitute CERCLA response costs. Therefore, the Court denies Defendants' motion for summary judgment with respect to this portion of Plaintiffs' CERCLA response costs claims and instructs Defendants to reimburse Plaintiffs for these costs. With respect to the consultant's fees that the Green Plaintiffs incurred, the Court finds that there is an issue of fact as to which of these fees constitute CERCLA response costs and, therefore, denies Defendants' motion for summary judgment with respect to this aspect of Plaintiffs' CERCLA response costs claims. Finally, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' CERCLA response cost claims in all other respects.

### b. Plaintiffs' contribution claims

The Green Plaintiffs have asserted a claim for contribution under § 113(f) of CERCLA, 42 U.S.C. § 9613(f).[11,12] Defendants contend that the Supreme Court held in *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004), that a party may only recover contribution under that provision if it has been sued.

_____

[11] Section 9613(f)(1) provides, in pertinent part, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following* any civil action under section 9606 of this title or under 9607(a) of this title. . . ." 42 U.S.C. § 9613(f)(1) (emphasis added).

[12] The Green Plaintiffs do not address their § 113(f) claim in their memorandum of law in response to Defendants' motion for summary judgment.

Defendants are correct that *Cooper Indus.*, following the natural meaning of § 113(f),

holds that a party may only seek contribution pursuant to § 113(f) during or following a civil

action brought pursuant to 42 U.S.C. § 9606 or 42 U.S.C. § 9607(a).  *See Cooper Indus.*, 543

U.S. at 166-68.  There is nothing in the record to indicate that any person has brought suit against

the Green Plaintiffs pursuant to either of these provisions.  Therefore, they may not seek recovery

pursuant to § 113(f).  Accordingly, the Court grants Defendants' motion for summary judgment

with respect to the Green Plaintiffs' claim pursuant to § 113(f) of CERCLA, 42 U.S.C. § 9613(f).


### 5. Plaintiffs' claims for diminution in property value and personal injury

#### a. Applicable statute of limitations

Defendants contend that the applicable statute of limitations bars some of Plaintiffs'

claims, specifically those for diminution in property value and personal injury.  Under New York

law, a plaintiff must generally commence "an action to recover damages for an injury to

property" or "an action to recover damages for a personal injury" within three years.  *See* N.Y.

C.P.L.R. § 214(4), (5) (McKinney 2003).  However,

> [n]otwithstanding the provisions of section 214, the three year
> period within which an action to recover damages for personal
> injury or injury to property caused by the latent effects of exposure
> to any substance or combination of substances, in any form, upon
> or within the body or upon or within property must be commenced
> shall be computed from the date of discovery of the injury by the
> plaintiff or from the date when through the exercise of reasonable
> diligence such injury should have been discovered by the plaintiff,
> whichever is earlier.

N.Y. C.P.L.R. § 214-c(2) (McKinney 2003).

Nevertheless,

> [n]otwithstanding the provisions of subdivisions two and three of
> this section, where the discovery of the cause of the injury is
> alleged to have occurred less than five years after discovery of the
> injury or when with reasonable diligence such injury should have
> been discovered, whichever is earlier, an action may be
> commenced or a claim filed within one year of such discovery of
> the cause of the injury; provided, however, if any such action is
> commenced or claim filed after the period in which it would
> otherwise have been authorized pursuant to subdivision two or
> three of this section, the plaintiff or claimant shall be required to
> allege and prove that technical, scientific or medical knowledge
> and information sufficient to ascertain the cause of his injury had
> not been discovered, identified or determined prior to the
> expiration of the period within which the action or claim would
> have been authorized and that he has otherwise satisfied the
> requirements of subdivisions two and three of this section.

N.Y. C.P.L.R. § 214-c(4) (McKinney 2003).

Finally,

> [t]his section shall be applicable to acts, omissions or failures
> occurring prior to, on or after July first, nineteen hundred eighty-
> six, except that this section shall not be applicable to any act,
> omission or failure:
>
> (a) which occurred prior to July first, nineteen hundred eighty-six,
> and
>
> (b) which caused or contributed to an injury that either was
> discovered or through the exercise of reasonable diligence should
> have been discovered prior to such date, and
>
> (c) an action . . . which was or would have been barred because the
> applicable period of limitation had expired prior to such date.

N.Y. C.P.L.R. § 214-c(6) (McKinney 2003) (footnote omitted).

### b. Accrual of cause of action

The Major Plaintiffs contend that latent injury causes of action accrue when the plaintiff

discovers both the injury and its cause.  *See* Dkt. No. 34 at Pt. 2 at 7 (citing *Griffin v. Garratt-Callahan Co.*, 74 F.3d 36, 38-39 (2d Cir. 1996); *Braune v. Abbott Laboratories*, 895 F. Supp. 530, 544 (E.D.N.Y. 1995)).  The Green Plaintiffs make the same contention.  *See* Dkt. No. 35 at Pt. 2 at 6-7 (citing *Griffin, Braune, and Atkins v. Exxon Mobil Corp.*, 9 A.D.3d 758, 780 N.Y.S.2d 666, 668 (3d Dep't 2004)).

In *In Matter of N.Y. County DES Litig.*, 89 N.Y.2d 506 (1997), the New York Court of Appeals addressed the question of "whether an 'injury' is discovered within the meaning of CPLR 214-c(2) when the symptoms become apparent or instead when the connection between those symptoms and the injured's exposure to a toxic substance is recognized."  *Id.* at 509.  The court held "that the time for bringing the action begins to run under the statute when the injured party discovers the primary condition on which the claim is based" and rejected the contention that accrual required "discovery of both the condition and the nonorganic etiology of that condition."  *Id.* at 509, 514.  The court reiterated this principle in *Whitney v. Quaker Chem. Corp.*, 90 N.Y.2d 845, 847 (1997) (quotation omitted).

Plaintiffs have not cited a New York Court of Appeals' decision or a Second Circuit decision subsequent to *In re N.Y. County DES Litig.* and *Whitney* that holds otherwise.  Furthermore, although the Green Plaintiffs cite *Atkins* to support their argument, that case does not support their position.  Accordingly, the Court concludes that, for purposes of § 214-c(2), a cause of action for latent injury accrues when the plaintiff becomes aware of his symptoms, regardless of when he learns what caused those symptoms.

### c. Claims for diminution in property value

Plaintiffs' diminution in property value claims essentially are based upon the argument that their properties' exposure to Site contaminants has reduced their market value.  Defendants assert that Plaintiff Paul Tanner witnessed the dumping of wastes at the Site in the 1960s and heard one of the former owners of Plaintiff James Major's property complain about her well water.  *See* Dkt. No. 30 at Pt. 3 at ¶¶ 78-79.  Even if these assertions are true, however, they do not indicate that Plaintiff Paul Tanner knew that his property was exposed to Site contaminants.  Therefore, the Court finds that Defendants have not shown that the statute of limitations bars Plaintiff Paul Tanner's diminution in property value claims.

In addition, Defendants contend that Plaintiffs James and Kathleen Major purchased their property in 1985 from her aunt, Mrs. Witczak.  *See id.* at ¶ 81.  They also state that Plaintiff Kathleen Major was aware in the 1960s that her aunt and uncle had problems with their well and did not drink water from it.  *See id.* at ¶ 82.  Furthermore, Defendants assert that documents related to the Witczak complaint about the well in the 1960s were in Plaintiffs James and Kathleen Major's house when they purchased it in 1985.  *See id.* at ¶ 83.  Even if all of Defendants' assertions are true, they do not show that, at the time that they purchased their house, Plaintiffs James and Kathleen Major knew that exposure to Site contaminants would affect its market value.  The fact that a person is aware that a parcel of land was affected with contaminants approximately twenty years earlier does not necessarily mean that they are aware that contaminants continue to affect their property, especially when the prior evidence of such contamination is no longer present.  Accordingly, the Court concludes that Defendants have not shown that the statute of limitations bars Plaintiffs James and Kathleen Major's claims for

diminution in property value.

Finally, Defendants assert that, at the time that Plaintiff Karen M. Green purchased her property in 1977, there was debris in the vicinity of the Site, including items such as a washing machine and glass bottles. *See id.* at ¶ 84. They also state that she visited from time to time with the previous owner of her property, who informed her that his family had dumped materials at the Site. *See id.* at ¶¶ 85-86. Even assuming that these allegations are true, there is no logical basis to believe that a reasonable person would infer that the dumping of various metal and plastic items would reasonably expose her to health risks. Accordingly, the Court concludes that Defendants have not show that the statute of limitations bars Plaintiff Karen M. Green's claim for diminution in property value.

### d. Claims for personal injury

Even if the Court had not precluded Plaintiffs from introducing medical expert testimony – which is the only expert testimony that links the Site contaminants to any of the Plaintiffs' medical conditions, specifically Plaintiff Karen M. Green's cervical cancer – the only other evidence in the record regarding this issue is that Plaintiff Karen M. Green suffered cervical cancer in the "1980s." *See* Dkt. No. 35 at Pt. 5 at 50; Dkt. No. 30 at Pt. 17 at 104:25-105:2. From these bare-bone assertions, it is impossible for the Court to determine whether New York Civil Practice Law and Rules § 214-c(6) applies. Accordingly, the Court concludes that Defendants have not shown that Plaintiff Karen M. Green's claims related to her cervical cancer are time-barred.

### 6. Plaintiffs' claims for fear of disease

All Plaintiffs assert claims for fear of disease.  Defendants contend that Plaintiffs have presented no evidence of the presence of any toxin in their bodies or that they have suffered from a toxin-induced disease.  The Major Plaintiffs respond that there is evidence that they face significant health risk.  The Green Defendants do not respond to Defendants' assertion.

> New York recognizes claims to recover damages for emotional distress . . . . However, a plaintiff must produce evidence which is sufficient to guarantee the genuineness of the claim . . . . To maintain a cause of action to recover damages for emotional distress following exposure to a toxic substance, a plaintiff must establish both that he or she was in fact exposed to a disease-causing agent and that there is a "rational basis" for his or her fear of contracting a disease . . . .

*DiStefano*, 2 A.D.3d at 485 (internal citations omitted).

Courts have "construed 'rational basis' to mean 'the clinically-demonstrable presence of a toxin in the plaintiff's body, or some other indication of a toxin-induced disease' . . . ."  *Id.* (internal citations omitted).

None of the Plaintiffs have produced any evidence of toxins in their bodies.  Furthermore, only Plaintiff Karen M. Green has produced any expert testimony of a toxin-induced disease and then only by relying upon Wolfson's affidavit, and the Court has precluded Plaintiffs from introducing this affidavit and has precluded Wolfson from testifying at trial.  Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' fear of disease claims.

### 7. Plaintiffs' battery claims

All Plaintiffs assert battery claims.  Defendants contend that there is no evidence that they intentionally contacted Plaintiffs and that the applicable statute of limitations bars Plaintiffs' battery claims.  Plaintiffs respond that the doctrines of transferred intent and continuing tort apply to this case.

"A valid claim for battery exists where a person intentionally touches another without that person's consent . . . ."  *Wende C. v. United Methodist Church*, 4 N.Y.3d 293, 298 (2005) (internal citations omitted).  Plaintiffs' reliance upon the doctrine of transferred intent is apparently a concession that they do not have evidence that Defendants intended to physically contact them.  To establish transferred intent, Plaintiffs must at least prove that Defendants intended to physically contact someone.  *See Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344 (1928) (defining a case of "transferred intent" as one where "an act willfully dangerous to A result[s] by misadventure in injury to B" (citation omitted)).  Plaintiffs assert that Defendants intended to physically contact the Taylor family when they dumped wastes at the Site in the 1960s.  Defendants respond that there is no evidence in the record that they had such an intent.

There is no dispute that Defendants disposed of wastes on the Site while the Taylor family lived there.  The intentional disposal of wastes on someone's property is equivalent to an intentional physical contact with that person only if the disposer knows that the waste will contact that person.  Plaintiffs have presented no evidence that Defendants knew that the wastes would contact the Taylor family whether by air, soil, or water.  Accordingly, because Plaintiffs have not pointed to any evidence in the record that indicates that Defendants intentionally physically contacted either Plaintiffs or the Taylor family, the Court grants Defendants' motion

for summary judgment with respect to Plaintiffs' battery claims.[13]

### 8. Plaintiffs' claims for intentional infliction of emotional distress

All Plaintiffs assert claims for intentional infliction of emotional distress.  Defendants contend (1) that there is no evidence that they have taken action directed toward Plaintiffs, (2) that there is no evidence that they have engaged in any outrageous conduct, and (3) that a one-year statute of limitations bars these claims.  Plaintiffs respond that Defendants did take actions that had a substantial probability of causing them severe emotional distress and that the continuing tort doctrine is applicable.

There is no dispute that a one-year statute of limitations applies to Plaintiffs' claims for intentional infliction of emotional distress.  Thus, the only issue is whether the continuing tort doctrine applies to these claims.

The tort of intentional infliction of emotional distress "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv)

---

[13] As an alternative basis for summary judgment, Defendants assert that the one-year statute of limitations in N.Y. C.P.L.R. § 215(3) bars Plaintiffs' battery claims.  Plaintiffs concede that § 215(3) is applicable but assert that the continuing tort doctrine also applies.  Plaintiffs, however, do not cite any authority for the proposition that the continuing tort doctrine is applicable to battery claims.  In fact, case law rejects such a proposition.  *See Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 204 (E.D.N.Y. 1998) ("Causes of action for assault and battery accrue immediately upon the occurrence of the tortious act and thus, are not appropriate for the continuing violation exception." (citation omitted)); *Abdullajeva v. Club Quarters, Inc.*, No. 96 CIV. 0383, 1996 WL 497029, *7 (S.D.N.Y. Sept. 3, 1996); *Galvin v. Francis*, 2003 N.Y. Slip. Op. 51095(U), 2003 WL 21696740, *2 (N.Y. Sup. Ct. Richmond County May 29, 2003) (quotation omitted).  Accordingly, the Court finds that the applicable statute of limitations for battery claims also provides a basis for granting Defendants' motion for summary judgment motion.

severe emotional distress." *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115, 121 (1993).  In order

to be actionable, "[t]he conduct must also be intentionally directed at the plaintiff . . . ."  *Martin*

*v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).

To establish a claim for intentional infliction of emotional distress, a plaintiff must show

either intent or recklessness.  If an entity dumped a severe toxin into someone's drinking supply,

resulting in severe emotional distress to that person, a claim of intentional infliction of emotional

distress might lie against that entity.  Likewise, if an entity dumped a toxin in a place where it

was evident that the toxin would migrate into someone's drinking supply, and such toxin caused

that person severe emotional distress, the entity might be liable for intentional infliction of

emotional distress.  However, if an entity dumped a toxin in a location from which it is not

evident that it would impact anyone's water supply and burned the toxin where it is not evident

that the smoke would harm anyone, it cannot be said, without some explicit expression of intent,

that the entity acted with the intent to cause emotional distress to anyone or with recklessness to

the possibility to such distress.  The record indicates that this case falls squarely within the latter

type of situation.  Accordingly, the Court grants Defendants' motion for summary judgment with

respect to Plaintiffs' claims for intentional infliction of emotional distress.

### 9. Plaintiffs' New York Navigation Law claims

All Plaintiffs assert claims pursuant to New York Navigation Law §§ 176(8), 181(1),

(5).[14]  Defendants contend that they did not discharge petroleum at the Site.  Plaintiffs do not

---

[14] Section 176(8) provides that "[n]otwithstanding any other provision of law to the
contrary . . . every person providing cleanup, removal of discharge of petroleum or relocation of

(continued...)

-42-

respond to Defendants' contention.  For purposes of Plaintiffs' claims, New York law defines

"petroleum" as "oil or petroleum of any kind and in any form including, but not limited to, oil,

petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other wastes and crude oils, gasoline and

kerosene . . . ."  N.Y. Nav. Law § 172(15) (McKinney 2004).  There is nothing in the record to

indicate that Defendants discharged petroleum at the Site.  Accordingly, the Court grants

Defendants' motion for summary judgment with respect to Plaintiffs' New York Navigation Law

claims.


### 10. Plaintiffs' trespass claims

Defendants argue that the Court should dismiss Plaintiff Karen M. Green's trespass claim

because they had the prior owner's consent to dispose of wastes at the Site.  However, Defendants

point to nothing in the record that shows such consent.  Accordingly, the Court denies

Defendants' motion for summary judgment with respect to this claim.

---

[14](...continued)
persons pursuant to this section shall be entitled to contribution from any other responsible
party."  N.Y. Nav. Law § 176(8) (McKinney 2004).  Section 181(1) provides, in pertinent part,
that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault,
for all cleanup and removal costs and all direct and indirect damages, no matter by whom
sustained, as defined in this section. . . ."  N.Y. Nav. Law § 181(1) (McKinney 2004).  Section
181(5) provides that

> [a]ny claim by any injured person for the costs of cleanup and
> removal and direct and indirect damages based on the strict
> liability imposed by this section may be brought directly against
> the person who has discharged the petroleum, provided, however,
> that damages recoverable by any injured person in such a direct
> claim based on the strict liability imposed by this section shall be
> limited to the damages authorized by this section.

N.Y. Nav. Law § 181(5) (McKinney 2004).

With respect to the other Plaintiffs, Defendants contend that the Court cannot reasonably infer that Defendants knew or expected that the wastes that they dumped would migrate to the other Plaintiffs' property.  Under New York law, for an intrusion of property to be a trespass, it "'must at least be the immediate or inevitable consequence of what [the trespasser] willfully does, or which he does so negligently as to amount to willfulness.'"  *Scribner v. Summers*, 84 F.3d 554, 557 (2d Cir. 1996) (quotation and other citation omitted).

The Major Plaintiffs respond that the jury should decide this issue.  They point to Plaintiff Paul Tanner's deposition testimony:

> Q:    Could you smell the fumes from your house 1500 feet [sic]
>          away?
>
> A:       Well, I am to the east of it, so if there was a
>             westerly breeze, yes, you could.

*See* Dkt. No. 34 at Pt. 13 at 59:6-9.

Although not dispositive of this issue, this testimony at the very least raises an issue of fact as to whether the invasion of the fumes on properties adjacent to the Site was an "immediate or inevitable consequence" of the burning of the waste.  Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiffs' trespass claims.


### 11. Plaintiffs' claims for latent injury, pain and suffering, and hypersensitivity

All Plaintiffs assert claims for latent injury and pain and suffering.  The Green Plaintiffs also assert hypersensitivity claims.  Defendants contend that these claims are not independent causes of action but are merely types of damage for which Plaintiffs might recover pursuant to other causes of action.  Plaintiffs' only response is that the Court should allow the jury to

consider evidence of such damages.

Although courts often refer to "pain and suffering" as a cause of action and, although New York distinguishes a cause of action for "pain and suffering" accompanying a wrongful death from a cause of action for the wrongful death itself, *see Caffaro v. Trayna*, 35 N.Y.2d 245, 247-48 (1974), generally, "pain and suffering" is not a cause of action, *see Arum v. Miller*, 331 F. Supp. 2d 99, 112 (E.D.N.Y. 2004) (citation omitted).  This is clear from the statement "pain and suffering" itself.  A cause of action must somehow connect a defendant's action to a plaintiff's injury.  Stating that one has experienced pain and suffering says nothing about whether some other person is potentially responsible for the pain and suffering.  Therefore, pain and suffering is properly a form of damages that a plaintiff may be able to recover if he establishes, for example, a claim for negligence or strict products liability.

Likewise, a plaintiff may suffer hypersensitivity to particular stimuli as a form of damage resulting from a defendant's conduct.  However, the Court has been unable to find a New York case in which the court considered "hypersensitivity" to be a cause of action.  Again, in order for a plaintiff to recover damages for his hypersensitivity, he must first link the defendant's conduct to his condition by establishing, for example, a claim of negligence or strict products liability.

Finally, the concept of "latent injury" is legally significant because it raises difficult questions about when a plaintiff's cause of action accrues.  However, as noted with respect to "pain and suffering" and "hypersensitivity," the fact that a plaintiff has suffered a latent injury suggests nothing about the basis upon which a defendant may be liable for that injury.  Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' "pain and suffering," "hypersensitivity," and "latent injury" claims.

### 12. Plaintiffs' res ipsa loquitur claims

All Plaintiffs assert *res ipsa loquitur* claims.  Defendants contend that *res ipsa loquitur* is a rule of evidence, not a cause of action.  Plaintiffs' only response is that the Court should allow the jury to consider evidence of *res ipsa loquitur*.  Defendants are correct that *res ipsa loquitur* is not a cause of action.  *See Abbott v. Page Airways, Inc.*, 23 N.Y.2d 502, 512 (1969) (noting that "[t]he principle that 'the thing speaks for itself' does not state a separate theory on which a plaintiff may recover for injury"); *Frew v. Hosp. of Albert Einstein Coll. of Med. Div. of Montefiore Hosp. & Med. Ctr.*, 76 A.D.2d 826, 826 (2d Dep't 1980) (finding that "*[r]es ipsa loquitur* is an evidentiary rule and as such does not constitute a separate cause of action").  Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' *res ipsa loquitur* claims.

### 13. Plaintiffs' equitable restitution claims

All Plaintiffs assert equitable restitution claims.[15]  Defendants contend that Plaintiffs may

---

[15] Specifically, the Major Plaintiffs allege that

> 71.    Upon information and belief, each Defendant caused and/or contributed to the release or threatened release of hazardous substances and/or the discharge or discharges of petroleum at the Site and from the Site.
> 72.    Plaintiffs have incurred damages and costs with respect to said discharges, and Defendants have been unjustly enriched, in that Defendants have not compensated Plaintiffs for such damages and costs.

*See* The Major Plaintiffs' Complaint at ¶¶ 71-72.

The Green Plaintiffs allege that

(continued...)

-46-

not seek equitable restitution because they have not performed any duty that Defendants owed. Plaintiffs respond that they have paid attorneys and consultants to protect their interests when Defendants failed to do so.

It is not completely clear what Plaintiffs' theory of liability is. Restitution is not an avenue to recover general costs. Restitution generally is an appropriate remedy when A has conferred a benefit on B under such circumstances that B's retention of the benefit would be unjust. *See* Restatement (First) of Restitution § 1 (1937). The only case that Plaintiffs cite to support their claims that they are entitled to restitution is *City of N.Y. v. Lead Indus. Ass'n, Inc.*, 222 A.D.2d 119 (1st Dep't 1996). In that case, the court noted that

> [a] cause of action for restitution is defined in Section 115 of the Restatement of Restitution as follows:
>
> > "A person who has performed the duty of another by supplying things or services although acting without the other's knowledge or consent, is entitled to restitution from the other if (a) he acted unofficiously and with intent to charge therefor, and (b) the things or services supplied were immediately necessary to satisfy the requirements of public decency, health, or safety."

*Id.* at 125 (quotation omitted).

---

[15](...continued)
> 79. Upon information and belief, each Defendant caused and/or contributed to the release or threatened release of hazardous substances and/or the discharge or discharges of petroleum at the Site and Property.
> 80. Plaintiffs have incurred damages and costs with respect to the Site and Property, and Defendants have been unjustly enriched, in that Defendants have not contributed and have not compensated Plaintiffs for such damages and costs.

*See* The Green Plaintiffs' Amended Complaint at ¶¶ 79-80.

Defendants argue that the expenses that Plaintiffs seek to recover under this cause of action – attorney's and consultant's fees – are related to Plaintiffs' protection of their personal interests rather than to a public benefit.  However, there is a more fundamental problem with Plaintiffs' claims for equitable restitution.  CERCLA permits the recovery, from a responsible party, of "any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(B).  In turn, CERCLA defines "response" as "remove, removal, remedy, and remedial action . . . ."  42 U.S.C. § 9601(25) (footnote omitted).  Finally, CERCLA defines "remedy" or "remedial action" as

> those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment, [including, but not limited to,] provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.

42 U.S.C. § 9601(24).

Based upon this language, it appears that any action that was "immediately necessary to satisfy the requirements of public decency, health, or safety" under the Restatement of Restitution would also be a "necessary cost of response" under CERCLA.  Thus, to permit a plaintiff to assert both a claim for restitution in addition to, or in lieu of, a CERCLA cost recovery claim would allow him to circumvent the detailed procedural mechanism that Congress established as part of CERCLA.  It is for this reason that the Second Circuit has held that CERCLA preempts state law restitution claims.  *See In re Duplan Corp.*, 212 F.3d 144, 150 n.7 (2d Cir. 2000) (citations omitted); *Bedford Affiliates v. Sills*, 156 F.3d 416, 427 (2d Cir. 1998).  Accordingly,

-48-

the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claims for equitable restitution.

### 14. The Green Plaintiffs' state-law contribution claims

The Green Plaintiffs assert a contribution claim pursuant to Article 14 of the New York Civil Practice Law and Rules.[16]  Defendants contend that the Green Plaintiffs are not entitled to contribution under this provision because no party has obtained a judgment against them or even sued them.

New York law provides that "[t]he amount of contribution to which a person is entitled shall be the excess paid by him over and above his equitable share of the judgment recovered by the injured party; but no person shall be required to contribute an amount greater than his equitable share. . . ."  N.Y. C.P.L.R. § 1402 (McKinney 1997).  There is no evidence in the record that an injured party has recovered a judgment against the Green Plaintiffs.  Thus, it appears that the Green Plaintiffs may not maintain a contribution claim under Article 14.

---

[16] Specifically, the Green Plaintiffs allege that

> 75.    Upon information and belief, each Defendant caused or contributed to the release or threatened release of hazardous substances and/or the discharges of petroleum at the Site and Property.
> 76.    Plaintiffs have incurred *response costs*, damages and costs as a result of the release and threatened release of hazardous substances and other wastes, and discharge or discharges of petroleum at, on or near the Site and Property caused or contributed to by Defendants, and each of the Defendants is jointly and severally liable together with Plaintiffs for such costs.

*See* The Green Plaintiffs Amended Complaint at ¶¶ 75-76.

There is an additional problem with the Green Plaintiffs' state-law contribution claim.  As noted above, CERCLA's cost-recovery provisions preempt state-law claims seeking restitution for response costs.  Likewise, CERCLA's contribution provisions preempt state-law claims seeking contribution for response costs.  *See In re Duplan Corp.*, 212 F.3d at 150 n.7 (citation omitted); *Bedford Affiliates*, 156 F.3d at 427.  Accordingly, the Court grants Defendants' motion for summary judgment with respect to the Green Plaintiffs' state-law claims for contribution pursuant to Article 14 of the New York Civil Practice Law and Rules.

### 15. Plaintiffs' claims for diminution of property value

Defendants argue that the Court should dismiss Plaintiff Jeffrey Green's and the Major Plaintiffs' claims for diminution in property value on the ground that a plaintiff may not maintain such a claim unless there has been actual contamination or other damage to the plaintiff's property.  Even assuming that Defendants' contention accurately reflects the law, they have not shown that they are entitled to dismissal on this ground.  First, Sawyer's expert report indicates that contaminants from the Site have impacted the Major Plaintiffs' water supplies even if currently the contaminants are present at below regulatory levels.  *See* Dkt. No. 49 at Pt. 9 at 32.  Second, NYSDEC's ROD provides for the continued treatment of Plaintiffs' residential water supplies until at least April 2006.  *See* Dkt. No. 58 at Pt. 5 at 15.  These two facts are sufficient to show that Plaintiff Jeffrey Green's and the Major Plaintiffs' claims for diminution in property value go beyond mere allegations of stigma.  Even if these Plaintiffs cannot show that they have been exposed to contaminants from the Site in concentrations that exceed the regulatory standards, their past and potential future exposure to such contaminants in some measurable

concentrations creates a genuine issue of fact with respect to their diminution of property value claims.  Accordingly, the Court denies Defendants' motion for summary judgment with respect to Plaintiff Jeffrey Green's and the Major Plaintiffs' claims for diminution in property value.

**C.       The Green Plaintiffs' motion for partial summary judgment**

The Green Plaintiffs move for summary judgment with respect to Defendants' CERCLA counterclaims and Plaintiff Karen Green's response-cost claims.  Specifically, the Green Plaintiffs argue (1) that Plaintiff Karen M. Green is not a potentially responsible party; (2) that Defendants are jointly and severally liable pursuant to 42 U.S.C. § 9607(a)(3), (4); and (3) that Plaintiff Karen M. Green is entitled to her past and future response costs pursuant to 42 U.S.C. § 9607(a)(3), (4).  Defendants' only response is that Plaintiff Karen M. Green cannot establish that she qualifies for the "innocent-purchaser" defense because she failed to undertake all appropriate inquiries, which she was required to do in order to rely upon this defense.

*1. Defendants' CERCLA counterclaims*

Defendants assert a counterclaim for contribution pursuant to § 9613(f) and a counterclaim for a declaration of proportional liability pursuant to § 9613(g)(2).[17]

---

[17] Section 9613(f)(1) provides, in pertinent part, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under 9607(a) of this title."  42 U.S.C. § 9613(f)(1).  Section 9613(g)(2) begins by providing the statutes of limitations for § 9607 cost-recovery actions, distinguishing removal actions from remedial actions.  *See* 42 U.S.C. § 9613(g)(2).  This section then states that "[i]n any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. . . ."

(continued...)

Among those persons that CERCLA holds potentially liable for response costs is "the owner or operator of a vessel or a facility . . . ."  42 U.S.C. § 9607(a)(1).  Plaintiff Karen M. Green concedes that she falls within § 9607(a)(1).  *See* Dkt. No. 35 at Pt. 2 at 10.  Therefore, unless she can establish a defense, she is jointly and severally liable for response costs.  She seeks to establish such a defense pursuant to § 9607(b)(3).  Section 9607 provides, in pertinent part, that

> [t]here shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by –
>
> * * *
>
> **(3)** an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . ., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions . . . .

42 U.S.C. § 9607(b).

### a. Contractual relationship

Defendants contend that Plaintiff Karen M. Green may not take advantage of the

---

[17](...continued)

*Id.*  Although Defendants claim to seek a declaratory judgment pursuant to § 9613(g)(2) itself, no such cause of action exists.  Since Defendants have not asserted a § 9607 cost-recovery cause of action, § 9613(g)(2) does not apply to their counterclaim.

§ 9607(b)(3) defense because she had a contractual relationship with "a prior owner who had

caused or permitted the contamination of the property through his act or omission." *See* Dkt. No.

48 at 2.  Defendants are correct that CERCLA provides that a "contractual relationship" may

include "land contracts, deeds, easements, leases, or other instruments transferring title or

possession . . . ."  42 U.S.C. § 9601(35)(A).  However, the Second Circuit has interpreted "in

connection with" in § 9607(b)(3) to prevent a party from being liable for response costs merely

because it purchased property from a potentially responsible party.  In *Westwood Pharm., Inc. v.*

*Nat'l Fuel Gas Distribution Corp.*, 964 F.2d 85 (2d Cir. 1992), the Second Circuit held that

> the phrase "in connection with a contractual relationship" in
> CERCLA § 107(b)(3) requires more than the mere existence of a
> contractual relationship between the owner of land on which
> hazardous substances are or have been disposed of and a third party
> whose act or omission was the sole cause of the release or
> threatened release of such hazardous substances into the
> environment, for the landowner to be barred from raising the third-
> party defense provided for in that section.  In order for the
> landowner to be barred from raising the third-party defense under
> such circumstances, the contract between the landowner and the
> third party must either relate to the hazardous substances or allow
> the landowner to exert some element of control over the third
> party's activities.

*Id.* at 91-92; *see also New York v. Lashins Arcade Co.*, 91 F.3d 353, 360 (2d Cir. 1996) (quoting
[*Westwood Pharm.*,] 964 F.2d at 91-92).

Defendants argue that *Westwood Pharm.*, *Lashins Arcade*, and the cases in this Circuit

following them represent a minority position and effectively eliminate the specific requirements

that 42 U.S.C. § 9601(35) establishes for the innocent-purchaser defense.  In support of their

position, Defendants cite three district court cases from outside of this Circuit.  The Court rejects

this argument.  The Second Circuit has specifically held that "[a] decision of a panel of this Court

is binding unless and until it is overruled by the Court *en banc* or by the Supreme Court." *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) (citing *Wisdom v. Intrepid Sea-Air Space Museum*, 993 F.2d 5, 7 (2d Cir. 1993) (per curiam)).  This Court has no authority to overrule clearly controlling Second Circuit decisions, even if they espouse a "minority" position.  Furthermore, the Court notes that, although Congress has, since *Lashins Arcade* was decided, amended § 9601 four times and § 9607 twice, the amended text does not bring into question the holdings of *Westwood Pharm.* and *Lashins Arcade*.[18]  Accordingly, the Court holds that, pursuant to *Westwood Pharm.* and *Lashins Arcade*, the mere fact that Plaintiff Karen M. Green purchased land containing the Site from a potentially responsible party does not preclude her from asserting § 9607(b)(3)'s third-party defense.

### b. Due care

Plaintiff Karen M. Green asserts that she exercised due care by (1) reporting Defendants' disposal activities to state agencies as soon as she was aware of them, (2) warning her neighbors of the potential contamination of their drinking supplies, and (3) hiring an environmental consultant to ensure that Defendants' response was effective.  Consistent with their theory that Plaintiff Karen M. Green must satisfy § 9601(35)'s innocent-purchaser defense, Defendants respond that she failed to engage in appropriate inquiries with respect to the Site.

Specifically, Plaintiff Karen M. Green states that, at the time that she purchased her property, she was not aware that Defendants had disposed of chemicals on it, and no one

---

[18] The Court notes, however, that the "bona fide prospective purchaser" defense, applicable to those who acquire ownership of a facility after January 11, 2002, appears to abrogate *Westwood Pharm.* and *Lashins Arcade*.  *See* 42 U.S.C. §§ 9601(40), 9607(r)(1).

informed her about the presence of the Site.  *See* Dkt. No. 35 at Pt. 5 at ¶ 35.  She also asserts

that she first heard about Defendants' dumping activities in 1998.  *See id.* at ¶ 37.  Defendants

have not presented any evidence to contradict either of these statements.  *See* Dkt. No. 47 at Pt. 6

at ¶¶ 35, 37.  Thus, the Court concludes that Plaintiff Karen M. Green has shown that there is no

genuine issue that she did not know about the Site until 1998, at which time she immediately

sought assistance from NYSDEC and NYSDOH.  *See* Dkt. No. 35 at Pt. 5 at ¶¶ 38-39.  She

could only actively exercise "due care" after she became aware of the Site.  Therefore, the Court

holds that she has established that, "in light of all relevant facts and circumstances," 42 U.S.C.

§ 9607(b)(3), she exercised due care with respect to the hazardous substance concerned.


### c. Precautions against foreseeable acts or omissions

Plaintiff Karen M. Green argues that she could not have taken precautions against any

third-party acts or omissions because such acts or omissions occurred more than ten years prior

to her purchase of the property.  Defendants do not respond to this argument.  As the Second

Circuit concluded in *Lashins Arcade*,

> [t]he second requirement for the successful assertion of a third-
> party defense demands that the defendant shall have taken adequate
> precautions against actions by the third party that would lead to a
> release of hazardous waste.  Given that the last release in the
> instant case happened more than fifteen years before Lashins'
> purchase of the Arcade, there was obviously nothing Lashins could
> have done to prevent actions leading to a release.

*Lashins*, 91 F.3d at 360.

Likewise in the present case, there is no evidence in the record that Plaintiff Karen M.

Green could have done anything to prevent Defendants' actions.  Therefore, the Court concludes

that she has satisfied the second prong of the third-party defense.

### d. Conclusion

Plaintiff Karen M. Green has shown that there is no genuine issue with respect to whether she qualifies for § 9607(b)(3)'s third-party defense.  Therefore, she may not be liable to Defendants for contribution or for a declaration of proportional liability.  Accordingly, the Court grants her motion for partial summary judgment with respect to Defendants' § 9613(f), (g)(2) counterclaims.

### 2. Plaintiff Karen M. Green's response-cost claims

As noted above,

> [a] *prima facie* cause of action under CERCLA requires a plaintiff to establish: (1) defendant fits one of the four classes of responsible parties outlined in § 9607(a); (2) the site is a facility; (3) there is a release or threatened release of hazardous substances at the facility; (4) the plaintiff incurred costs responding to the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan set up under the Act and administered by the EPA in order to prioritize hazardous substance release sites throughout the nation.

*B.F. Goodrich*, 958 F.2d at 1198 (citation omitted).

Plaintiff Karen M. Green contends that Defendants are potentially responsible parties ("PRPs") pursuant to 42 U.S.C. § 9607(a)(3), which provides that PRPs include

> any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party

-56-

> or entity and containing such hazardous substances . . . .

42 U.S.C. § 9607(a)(3).

The parties do not dispute that Cowles dumped hazardous wastes at the Site from as early as 1960 until at least 1966.  *See* Dkt. No. 47 at Pt. 6 at ¶ 7.  Furthermore, Defendants concede (1) that Cowles merged with Stauffer Chemical Company in 1967, (2) that Bayer CropScience, Inc. (whom Plaintiffs have sued as Defendant Aventis) is Stauffer Chemical Company's corporate successor, and (3) that Defendant SMC has contractually agreed to indemnify Bayer CropScience, Inc. for certain environmental liabilities, including any related to the Site.  *See* Dkt. No. 30 at Pt. 3 at ¶¶ 5-7.  Thus, the Court concludes that Plaintiff Karen M. Green has shown that there is no genuine issue that Defendants are PRPs with respect to the Site.  Likewise, the Court concludes that there is no genuine issue that the Site is a facility within the meaning of 42 U.S.C. § 9601(9),[19] *see* Dkt. No. 47 at Pt. 6 at ¶ 7, or that a release of hazardous substances occurred at the Site within the meaning of 42 U.S.C. § 9601(22),[20] *see id.*

The dispute between the parties concerns whether Plaintiff Karen M. Green incurred "necessary costs of response . . . consistent with the national contingency plan . . . ."  42 U.S.C. § 9607(a)(4)(B).  As noted above, there are genuine issues with respect to whether certain of her environmental consultant's fees might be recoverable response costs.  More specifically, there are

---

[19] CERCLA's definition of "facility" includes "(A) any . . . well, pit, pond, lagoon, impoundment, ditch, landfill . . . or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ."  42 U.S.C. § 9601(9).

[20] CERCLA's definition of "release" includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."  42 U.S.C. § 9601(22).

genuine issues as to whether they are *necessary* costs of *response* that are *consistent* with the

NCP.  In light of the fact that the parties do not address the NCP and the uncertainty about

precisely who did what when, it is impossible for the Court to determine which, if any, of

Plaintiff Karen M. Green's environmental consultant's fees might be recoverable.  Accordingly,

the Court denies her motion for partial summary judgment with respect to her CERCLA response

cost claims.


## IV. CONCLUSION

Accordingly, after reviewing the entire file in this matter, the parties' submissions, and the

applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion to strike Wolfson's affidavit and to preclude him from

testifying at trial is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to strike Sawyer's affidavit and to preclude him from

testifying at trial is **GRANTED** insofar as Sawyer is precluded from testifying about his new

opinions and the evidence contained in his affidavit and is **DENIED** insofar as Sawyer may

testify about what is in his expert report; and the Court further

**ORDERS** that Defendants' motion to preclude Plaintiffs' appraisal expert, Whittington,

from testifying at trial is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to preclude Plaintiffs' environmental engineering

expert, Millspaugh, from testifying at trial is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment regarding Plaintiffs' medical

monitoring claims is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment regarding Plaintiffs' RCRA claims is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment regarding the Green Plaintiffs' CERCLA response-cost claims is **GRANTED** insofar as it pertains to their request for attorney's fees related to the negotiation of access to the Site and is **DENIED** insofar as it pertains to their request for attorney's fees related to the identification of potentially responsible parties and Defendants are hereby instructed to reimburse the Green Plaintiffs in the amount of $135 and is **DENIED** insofar as it pertains to their request for consultant fees because there is a genuine issue of fact as to whether some or all of these fees are recoverable response costs; and the Court further

**ORDERS** that Defendants' motion for summary judgment regarding the Major Plaintiffs' CERCLA response-cost claims is **GRANTED** insofar as it relates to their "laundry and filter expenses" and is **DENIED** insofar as it relates to their recovery of attorney's fees that they paid to their counsel for writing the May 12, 1999 letter to NYSDEC and NYSDOH and Defendants are hereby instructed to reimburse the Major Plaintiffs for these costs and is **GRANTED** insofar as it relates to the fees that they have paid to Wolfson and Sawyer; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiffs' CERCLA contribution claims is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment as to Plaintiffs' claims for diminution in property value and personal injury is **DENIED** because Defendants have not shown that these claims are barred by the applicable statute of limitations; and the Court further

**ORDERS** that Defendants' motion for summary is **GRANTED** with respect to Plaintiffs'

claims for fear of disease, battery, and intentional infliction of emotional distress; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiffs' New York Navigation Law claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** with respect to Plaintiffs' trespass claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiffs' latent injury, pain and suffering, hypersensitivity, re ipsa loquitur and equitable restitution claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** with respect to the Green Plaintiffs' state-law contribution claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** with respect to Plaintiff Jeffrey Green's and the Major Plaintiffs' claims for diminution in property value; and the Court further

**ORDERS** that the Green Plaintiffs' motion for partial summary judgment is **GRANTED** with respect to Defendants' CERCLA § 9613(f), (g)(2) counterclaims; and the Court further

**ORDERS** that the Green Plaintiffs' motion for partial summary judgment is **DENIED** with respect to Plaintiff Karen Green's CERCLA response-cost claims; and the Court further

**ORDERS** that Defendants' counsel shall initiate a telephone conference, using a professional teleconferencing service, with the Court and opposing counsel on **Wednesday, September 27, 2006, at 9:30 a.m.** for the purpose of setting a trial date for this matter.

**IT IS SO ORDERED.**

Dated: September 13, 2006
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge